# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **CRIMINAL NO. 24-CR-463 (CJN)** |
| **v.** | **:** | |
| | **:** | |
| **DEEPAK JAIN** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION TO COMPEL SEC INTERNAL FILES

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................... 1

   A.  Additional Background ................................................................................................ 1

LEGAL STANDARD .......................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

   A.  Defendant's Requests Fail to Meet the Materiality Standard ................................... 4

   B.  The SEC is Not Closely Aligned with the Prosecution ........................................... 7

      i.  The Presence and Involvement of SEC-OIG Agents Does Not Make the Entire SEC Part of the Prosecution Team ......................................................................................... 8

      ii.  The Government's Access to the SEC Files Does not Make the SEC Part of the Prosecution Team ........................................................................................................... 12

      iii.  The Government Did Not Seek Only Inculpatory Information from the SEC ............. 14

CONCLUSION................................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*United States v. Brooks*, 966 F.2d 1500 (D.C. Cir. 1992) ............................................................ 3, 4

*United States v. George*, 786 F. Supp. 56 (D.D.C. 1992)............................................................. 4, 5

*\*United States v. Libby*, 429 F. Supp.2d 1 (D.D.C. 2006) ..............................................3, 4, 11, 12

*United States v. Lloyd*, 992 F.2d 348 (D.C. Cir. 1993) ...................................................................... 3

*United States v. Nichols*, 1:21-cr-00117-RCL, 2023 WL 6809937 (D.D.C. Oct. 16, 2023)........... 7

*United States v. Nixon*, 418 U.S. 683 (1974) ................................................................................. 17

*United States v. Poindexter*, 727 F.Supp. 1470 (D.D.C. 1989)......................................................... 3

*United States v. Safavian*, 233 F.R.D. 12 (D.D.C. 2005) ............................................................... 3, 6

*United States v. Trie*, 21 F.Supp.2d 7 (D.D.C. 1998)....................................................................... 6

*\*United States v. Trump*, 753 F.Supp.3d 17 (D.D.C. 2024).....................3, 4, 6, 7, 9, 10, 11, 13, 14

**Statutes**

5 U.S.C. § 402.................................................................................................................................... 8

5 U.S.C. § 403(b) .............................................................................................................................. 8

**Rules**

Fed R. Crim. P. 16(a)(1)(E)................................................................................................................ 3

Fed. R. Crim. P. 17(c) ..................................................................................................................... 10

The United States of America, by and through undersigned counsel, files the following opposition to Defendant Deepak Jain's ("Defendant") Motion to Compel SEC Internal Files.

Defendant seeks to compel the Government to improperly expand the prosecution team to include SEC employees who neither participated in the investigation nor created documents as part of the prosecution, he seeks an overbroad production of documents that were created several years before the criminal investigation commenced, and he has proffered only conjecture and speculation to support that request.

For these reasons and as further detailed below, Defendant's motion is without merit and should be denied.

## BACKGROUND[1]

### A. Additional Background

In 2017, the SEC Office of Inspector General's Office of Audits released a report faulting the SEC's process for awarding data center contracts and specifically citing to faults with AiNET's Beltsville data center. *See* ECF No. 23-4, Ex. C. The audit specifically cast doubt on whether AiNET's facility met the minimum contract requirements, including, among other things, the requirement that the data center be Tier III certified or higher. *Id.* at 11. The audit report did not result in a referral to any component of the Department of Justice for further investigation.

After the SEC exited the Beltsville Data Center in 2018, AiNET filed a dispute against the agency in the Civilian Board of Contract Appeals, which is an independent tribunal housed within the General Services Administration, and which adjudicates contract disputes involving government agencies. The SEC Office of General Counsel initiated their own internal

---

[1] Rather than re-write a factual background section in this response, the Government incorporates by reference the procedural and factual background sections from its response to Defendant's motion for a bill of particulars, ECF No. 27 at 2-9. Additionally, the Government has followed the same naming conventions for exhibits across both motion responses to minimize confusion to the Court.

investigation at that time, ultimately countersuing the company.  As part of the general counsel's investigation, attorneys from the general counsel's office interviewed the purported owner of Uptime Council ("Individual 1" in the Indictment) and determined that the Tier IV certification letters were possibly fabricated.  The general counsel's office made a referral to the Department of Justice Civil Division, Fraud Section, which enlisted federal law enforcement agents from the Securities and Exchange Commission, Office of Inspector General ("SEC-OIG") to assist in the Civil Division's investigation.  Those agents began conducting interviews and collecting documents as part of the civil investigation.  Shortly thereafter, in or around the fall of 2020, the Civil Division referred the investigation to the Criminal Division, Fraud Section.  At that point, one of the SEC-OIG agents was assigned to the criminal investigation.  The reports and material that the SEC-OIG agents generated and collected prior to the criminal referral, the report the general counsel's office generated of their interview of Individual 1, and the referral that the general counsel's office made to the Civil Division were produced to Defendant as part of the Government's criminal discovery productions. The SEC-OIG agents who remained on the civil investigation were prevented from accessing any Grand Jury material that was collected as part of the criminal investigation.

The instant criminal case was investigated by SEC-OIG agents who worked exclusively on the criminal investigation, except for the original agent, who, as stated above, had done limited work prior to the criminal referral.  That agent retired from the SEC-OIG in the early stages of the investigation, and his investigative file has been produced in discovery.  None of the agents who worked on the either the criminal investigation or the civil investigation participated in the 2017 audit or the creation of the audit report.

**LEGAL STANDARD**

Rule 16 of the Federal Rules of Criminal Procedure requires that the government permit the defendant to inspect records that are 1) "within the government's possession, custody, or control," and 2) "material to preparing the defense." Fed R. Crim. P. 16(a)(1)(E).

Other district courts within the District of Columbia, when evaluating what is in the government's possession, custody or control, "have in the main been more concerned with fairness to the defendant, on the one hand, and the government's ease of access to the documents sought, on the other, than with the issue whether the documents are actually in the physical possession of the prosecutor." *United States v. Poindexter*, 727 F. Supp. 1470, 1477 (D.D.C. 1989). Those district courts have concluded that the government has the duty to search and produce information from other components of the government, which are "closely aligned with the prosecution." *United States v. Trump*, 753 F. Supp. 3d 17, 27 (D.D.C. 2024) (quoting *United States v. Libby*, 429 F. Supp. 2d 1, 6 (D.D.C. 2006)). "The closeness of any such alignment is fact-intensive and must be resolved on a case-by-case basis." *Id.* (internal quotations omitted).

The government has "a duty to search ... files maintained by branches of government 'closely aligned with the prosecution,'" if "there [is] enough of a prospect of exculpatory materials to warrant a search." *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (citation omitted); see also *United States v. Safavian*, 233 F.R.D. 12, 17 (D.D.C. 2005); *Trump*, 753 F. Supp. 3d at 25.

Materiality under Rule 16 is "not a heavy burden" but there must at least be "a strong indication" that the requested information will 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (quoting *United States v.*

*George*, 786 F. Supp. 56, 58 (D.D.C. 1992)).  The government need disclose Rule 16 material 'only if it enables the defendant significantly to alter the quantum of proof in his favor.' " *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996).

"Mere speculation—either that another agency is closely aligned with the prosecution or that a search of its files would yield favorable evidence—cannot support a claim that the prosecution has failed to fulfill its *Brady* obligations." *Trump*, 753 F. Supp. 3d at 26 (citing *Brooks*, 966 F.2d at 1504).

The legal standard governing the prosecution's *Brady* obligations with respect to these issues largely mirrors the standard under Rule 16.  *See Trump*, 753 F. Supp. 3d at 26; *Libby* 429 F. Supp. 2d at 9 n.15 ("the possession, custody or control analysis under *Brady* is identical to the analysis under Rule 16").

## ARGUMENT

Defendant seeks to compel the Government to produce overbroad discovery from the SEC—the putative victim of the offense—but has only made a speculative allegation of materiality.  Additionally, he improperly characterizes the SEC as closely aligned with the prosecution.

### A.  Defendant's Requests Fail to Meet the Materiality Standard

In requesting all internal communications regarding AiNET, Defendant has made an overbroad request that is not likely to enable him "significantly to alter the quantum of proof in his favor."  *See Graham*, 83 F.3d at 1474.

While a defendant does not bear a heavy burden to show that his or her request is material, he cannot base his request on "vague and unverified factual allegations," or require disclosure based on "mere speculation" or a "shot in the dark."  *United States v. Nichols*, 1:21-cr-00117-RCL,

2023 WL 6809937, at *5, *8 (D.D.C. Oct. 16, 2023) (analyzing the materiality standard under both *Brady* and Rule 16).  Additionally, courts disfavor overbroad requests.  *George*, 786 F. Supp. at 65.

Defendant alleges that, "the SEC internal files are certain to contain information that is exculpatory, impeaching, or at least helpful to the preparation of [his] defense."  Motion at 7. However, he provides no non-speculative reason that this would be the case, instead retreating to an almost-identical argument he made in his motion for a bill of particulars—that the government has not specifically identified exactly which criteria are at issue in this case.  Motion at 8.  As expanded in far greater detail in the Government's response to the motion for a bill of particulars, this argument fails on many levels.  First, the Government has spent significant time outlining its theory of the case to Defendant, through its discovery, multiple discussions, and three separate reverse proffer presentations.  *See* Response to Motion for Bill of Particulars, ECF No. 27 at 26-29.  Second, Defendant and the SEC exchanged significant correspondence regarding the faults of the data center, which have been in Defendant's possession since they were written, but which were also produced in discovery.  *See, e.g.*, Exhibits 9, 10, 11, 12.  In those notices, the SEC outlined the deficiencies with the data center, and Defendant continued to lie about the data center being Tier IV certified in his responses, showing that he was aware of the importance of meeting the minimum contract requirements.  *Id.*  There is nothing to suggest that the SEC did not actually care about these contract requirements, or that their internal communications would show that.

Defendant next argues that the documents are likely to contain impeachment material, but the most certainty he can muster is that the communications "***could*** contradict [SEC witnesses'] testimony at trial or otherwise cast doubt on their credibility." Motion at 8 (emphasis added). Here, Defendant makes clear that he is not seeking these documents as part of a prosecution team analysis

or because of some concern about deficient discovery, but rather to go on a wild fishing expedition in the hopes of uncovering some bias argument that has no support either in the caselaw or in the significant discovery that has been turned over to him.

The cases on which Defendant relies do not provide support that a conclusory statement about credibility or the potential presence of bias is enough to show materiality under either *Brady* or Rule 16. *See Trump*, 753 F. Supp. 3d at 28 (outlining defendant's argument that the requested documents were material because they would go to his own state of mind); *Safavian*, 233 F.R.D. at 17-18 (evaluating the materiality of statements made by the defendant, ethics guidelines and the procedure for issuing ethics guidelines promulgated by General Services Administration, emails of other individuals that could support a factual contention by the defendant); *United States v. Trie*, 21 F. Supp. 2d 7, 24-26 (D.D.C. 1998) (evaluating requests for interview memoranda and notes, material related to the defendant's knowledge, and the victim's potential complicity in the charged scheme). The discovery produced to date—whether it is in communications between the SEC and Defendant or between the SEC and other AiNET employees, internal SEC documentation like the award determination memo, or the more than 60 interview reports (along with their notes) that the Government has produced to Defendant—provides absolutely no support for the notion that internal communications would contradict any testimony these SEC witnesses may give if they were called to testify at trial, nor does Defendant even attempt to suggest there is some support for this theory in the discovery that has been turned over.

Materiality in this context is not a heavy burden, but it is a burden nonetheless. Defendant has made virtually no effort to allege materiality aside from conjecture and speculation. He has not met his burden and the motion should fail on this ground.

**B. <u>The SEC is Not Closely Aligned with the Prosecution</u>**

Even if Defendant's requests met the materiality standard, the SEC is not closely aligned with the prosecution such that the Government should search and produce the SEC's internal files. Defendant's arguments to the contrary fail for at least three reasons. First, Defendant conflates the SEC with the SEC Office of Inspector General. Second, Defendant asks this Court to go beyond the caselaw to find that regular employees of an agency who did not participate in the investigation are members of the prosecution team, making their historical communications and documents— the vast majority of which significantly predate the criminal investigation—part of the prosecution team's files. Third, Defendant mischaracterizes both the ease of access the government has to the requested documents as well as the nature of the documents produced to date.

Although, in certain circumstances, the prosecution team has a duty to reach beyond documents it holds in its own hands, courts have uniformly held that duty is not boundless. The prosecution team does not have an obligation to disclose "evidence held by *any* part of the leviathan of the federal government." *Nichols*, 2023 WL 6809937, at *12; *see Trump*, 753 F. Supp. 3d at 47-48 (finding that certain components of agencies were not part of the prosecution team for purposes of *Brady* and Rule 16 for various reasons, including (1) the reports one component created were not produced on behalf of the investigation and prosecution, (2) the information that the prosecution team obtained from another agency was done through compulsory process, which did not count as "extensive cooperation" under this Court's precedent, and (3) the security efforts a third agency undertook related to January 6 and the provision of some materials to the Special Counsel's office were not conducted in connection with the investigation). The mere fact that the government may call fact witnesses from an agency does not automatically make them part of the prosecution team. *See id.* at 49.

In making the argument that the entire SEC should be deemed to be part of the prosecution team, Defendant makes a number of assertions: 1) SEC agents investigated the case; 2) the prosecution team has "easy access" to the requested documents; and 3) that the Government, whether intentionally or unintentionally, limited its search for evidence to inculpatory materials. All of these arguments are unavailing.

    i.   The Presence and Involvement of SEC-OIG Agents Does Not Make the Entire SEC Part of the Prosecution Team

In the first instance, Defendant mischaracterizes SEC-OIG agents as "SEC Agents" and suggests that their involvement in the case makes every employee in the SEC part of the prosecution team. *See* Motion at 11 ("SEC Agents participated in each witness interview"); Motion at 13 ("The standard for production, as articulated time and again in this district's precedents, is whether the cooperating federal *agency* is aligned with the prosecution, not whether individual employees or particular divisions of an agency aided with the investigation.").

In making this argument, Defendant fundamentally misunderstands the role of the inspectors general. Inspectors general, while nominally part of an agency, exist to investigate and audit potential wrongdoing by agency employees or on contracts with the agency. For example, the Inspector General Act of 1978 specifically states that the purpose of inspectors general are to "create ***independent*** and ***objective*** units to conduct and supervise audits and investigations relating to the programs and operations of the establishments. . . ." 5 U.S.C. § 402(b)(1) (emphasis added). The Act goes on to note that inspectors general can only be removed by the President, rather than the head of the agency the inspector general is nominally part of. 5 U.S.C. § 403(b).

The SEC-OIG agents who participated in the criminal investigation are part of the prosecution team, and the government has produced and will continue to produce documents responsive to the government's discovery obligations that are in those SEC-OIG agents'

possession. But their involvement in the investigation does not somehow make every employee of the U.S. Securities and Exchange Commission part of the prosecution team.

Recently, another court in this district addressed a motion to compel in which counsel made agency-wide requests of a similar nature, and that court rejected those requests. In *Trump*, the defense asked that several agencies be deemed part of the prosecution team—the entire Special Counsel's Office; United States Attorney's Office for the District of Columbia; several offices within the Department of Justice, including the Office of the Attorney General, the Office of the Deputy Attorney General, and multiple litigating units within the department; the FBI's Washington Field Office; the United States Secret Service; the Cybersecurity and Infrastructure Security Agency; certain components of the Department of Defense; the Office of the Director of National Intelligence; the Central Intelligence Agency; and the January 6 Select Committee. 753 F.Supp.3d at 44-50. The district court rejected this maximalist approach, stating instead that the "court does not view the entirety of [the government components at issue] as a monolith, and so will deem only certain personnel therein as closely aligned with the prosecution" and said that only some files would be deemed to be in the prosecution's constructive control." *Id.* at 44 (internal quotations omitted).

Specifically, in reference to the Special Counsel's Office, the court found that, while the prosecution team is not just the individuals who are currently working on the matter and could include individuals who previously participated in the investigation, the entire Special Counsel's Office was not immediately part of the prosecution team. *Id.* at 44-45. Generally, the court analyzed the scope of the prosecution team based on participation in the investigation. *See id.* at 44-50. Because the United States Attorney's Office had joined the Special Counsel's investigation and they had created what was essentially a joint database for criminal discovery, the Court found

that the search must extend to files in that discovery "specifically regarding Defendant's indicted conduct in this case" but found that the defendant had not made the showing to include other January 6 cases in that search.  *Id.* at 46.  For other components of the Department of Justice, the Court found that certain members of the Department of Justice Office of Inspector General "participated in this investigation" and therefore were part of the prosecution team, but said that the government need not go further than it already had to produce discovery to the defendant.  *Id.* at 47.  Namely, it was sufficient that the government had searched the case files of the personnel who are working on the ***investigation*** and "who have worked on it previously."  *Id.*

The court did not order the government to conduct broad discovery searches over the entire Department of Justice, even though it found that personnel from several components of the Department of Justice participated in the investigation.  Crucially, the court drew a distinction between various components of the Department of Justice, treating, among others, the Office of Inspector General as its own component.  The same is true of the instant matter.  The involvement of SEC-OIG agents does not somehow make the entire U.S. Securities and Exchange Commission part of the prosecution team.  Defendant's position is essentially that any employee who ever sent any email regarding AiNET is a member of the prosecution team, even though those emails were sent several years before the criminal investigation ever began.  To be clear, these are not employees who were involved in an investigation of similar conduct as the charged conduct, or who prepared anything in anticipation of a criminal investigation or indictment, they are information technology employees, contracting officers, and other agency employees who worked with AiNET to try to make their data center operate as Defendant had promised it would.  To the extent Defendant seeks discovery from them or other employees of the SEC, it has other avenues of doing so.  *See* Fed. R. Crim. P. 17(c) (authorizing a party to seek a subpoena for documents

related to an upcoming trial, and authorizing the Court to direct a witness to produce the documents prior to trial); *Trump*, 753 F. Supp. 3d at 26 n.2 (citing to Rule 17(c) for the proposition that a "[d]efendant is not confined to the materials disclosed by the prosecution" and finding that "[h]e may gather evidence through his own investigation, including by issuing subpoenas as appropriate.").

The *Trump* court's analysis of two components of the Department of Homeland Security—United States Secret Service ("USSS") and Cybersecurity and Infrastructure Security Agency ("CISA")—is particularly instructive. The defense sought CISA's inclusion in the prosecution team because they "participated in security efforts relating to the 2020 election and January 6 and issued public reports regarding the 2020 election that the original Indictment (as well as the Superseding Indictment) credits." 753 F. Supp. 3d at 47-48. The court rejected that request because the reports were not undertaken or prepared on behalf of the investigation or prosecution. *Id.* at 48. With respect to USSS, the Court once again analyzed whether or not the USSS had lent its agents or other investigative resources to the case, or assisted the prosecution in anyway besides producing documents, and found that USSS was not part of the prosecution team. *Id.* at 48.

The same is true of the SEC here. As will be discussed in greater detail below, the prosecution team obtained a significant number of documents from the SEC as part of its investigation, but unlike the documents sought from the Office of the Vice President ("OVP") and the CIA in *Libby*, the SEC's documents were not the heart of the case. *See Libby*, 429 F. Supp. 2d at 11 (finding that without the contributions from the CIA and OVP, "it is unlikely that the indictment . . . would ever have been secured."). The primary evidence of Defendant's fraud came from his own company's servers and his own records—the fraudulent Uptime Council documents. Defendant transmitted the fraudulent 2011 certification as part of his bid to win the SEC data center

contract, which was in AiNET's possession.  Defendant's company transmitted the second fraudulent certification to the SEC in response to a request for an updated certification, which was also in AiNET's possession.  The Government also obtained records from a web hosting company showing that Defendant had registered and paid for the domain name for Uptime Council, the Government obtained records from Defendant's credit card provider showing he paid for the shared physical office space contract, and the Government obtained records from the shared physical office space provider itself, showing Defendant referring to himself as "manager" of Uptime Council.  *See* Exhibits 1, 17, 18, 20; DOJ-PROD-0000024315.[2]  To be sure, the Government also obtained documents from the SEC during its investigation, but similar to the CISA reports, which were referred to in the *Trump* indictment, those documents were not prepared as part of the investigation, they were simply records related to the contract at issue.  The fact that Defendant, in his motion, chose to ignore the locus of the fraud—his own extreme efforts to create a sham company and deceive the SEC into awarding a contract his company should not have received—and devise his own theory of the Government's case, does not change the nature of the prosecution team.

    ii.  <u>The Government's Access to the SEC Files Does not Make the SEC Part of the Prosecution Team</u>

The Government's access to the SEC's files is not akin to the access in *Libby*.  In *Libby*, the Court noted the fact that the White House counsel had directed "full cooperation" with the investigation, and following that, OVP began producing documents to the Special Counsel.  429 F. Supp. 2d at 10.  The CIA turned over its internal deliberations, legal analysis and opinions prepared by a CIA attorney regarding whether it was going to make a referral to the FBI, as well

---

[2] This is a large Excel file produced by Defendant's credit card provider showing his payment for the shared physical office space.  The Bates number is being provided for Defendant's ease of reference. If the Court wishes to review the file, the Government is happy to submit it under seal.

as communications between the CIA and the Department of Justice, to the Special Counsel. *Id.* at 10-11. Nor is the Government's access in this case exactly like its access to the USSS's files in *Trump*, in which it used compulsory process to obtain discovery. 753 F. Supp. 3d at 48. Here, the SEC's involvement was neither voluntary nor compelled. The SEC-OIG made no requests of the SEC for its communications, instead it used its own digital forensics and investigations unit to extract information from the SEC's files, and no explicit consent from the SEC was ever sought or obtained. *See* ECF No. 23-16, Ex. O (showing the "implied consent" of the SEC). Additionally, the Government received limited material from the SEC's Office of General Counsel, including two reports that were both generated ***before*** the referral to the Criminal Division—a memorandum of the general counsel's office interview of Individual 1, the supposed president of Uptime Council, and a referral memorandum to the DOJ Civil Division outlining the evidence that the general counsel's office had obtained. After the commencement of the criminal investigation, interviews with SEC employees, including interviews with individuals in the general counsel's office, were conducted the same as any witness interview—by a law enforcement agent who memorialized the interview in a report, all of which have been produced in discovery.

At best, Defendant's argument with respect to this point—that the SEC-OIG's access to the SEC's files make the SEC part of the prosecution team—is neutral as to its effect on the overall prosecution team analysis. The Government did not use compulsory process to obtain documents from the SEC, but the SEC did not participate in the investigation in a meaningful way. The SEC-OIG used its investigative authority to gather evidence from the SEC and conduct interviews of SEC employees.

iii.  <u>The Government Did Not Seek Only Inculpatory Information from the SEC</u>

Defendant argues that by obtaining all communications between the SEC and any AiNET employee, the Government, either intentionally or unintentionally, sought only inculpatory evidence from the SEC and baldly posits that nothing about the nature of the requested additional information makes the information difficult to access.  Motion at 12.  However, Defendant's argument fails on both counts.

Defendant cites to *Trump* for the proposition that there is a difference between a limited, specific set of requests and a broad or open-ended search for evidence but ignores the fact that a broad open-ended search is exactly what the Government conducted.  *See* 753 F. Supp. 3d at 49. The Government did not obtain some small subset of documents from the SEC that would surface only inculpatory information.  Instead, the Government used a categorical rule—any and all emails sent between anyone using an SEC email address and anyone using an AiNET email address.  That request would, and did, surface emails that were helpful to the Government's case and emails that were potentially helpful to Defendant's case.  Defendant suggests that internal emails between and among SEC employees would somehow be more probative of materiality than external emails but does not point to any non-speculative basis why that would be the case.  For most of the life of the contract, the SEC and AiNET were not engaged in litigation, they were attempting to work together on a data center that consistently presented problems.  There are myriad emails and interview reports that have already been produced showing the SEC addressing problems with the data center with AiNET employees, including issues regarding power, security, and temperature.  *See, e.g.*, DOJ-MOI-0000000413,    DOJ-MOI-0000000510,    DOJ-MOI-0000001769,    DOJ-MOI-0000002289, DOJ-MOI-0000001474, DOJ-MOI-0000002149, DOJ-MOI-0000000722 (interview

reports).[3]   There is nothing to indicate that, in reality, the SEC employees did not care if the data center lost power, or if the temperature spiked to a level that caused servers to automatically turn off instead of being destroyed.   Defendant can point to no reason why the contemporaneous accounts of the SEC employees that were shared with AiNET employees would be any different than the contemporaneous accounts of SEC employees that were not shared with AiNET employees.

Additionally, Defendant did not seem confused as to what was material to the SEC in his bid to win the contract at the time he lied to obtain it.  *See* Exhibit 4 at 4 ("We note that there is a difference between a data center classification that has been <u>certified by experts</u> and *claims* of satisfying classification requirements." (emphasis in original)); at 6 ("AiNET's Primary Data Center is Tier IV *certified* by a Professional Engineer to meet or exceed TIA-942-2.  The most recent certificate is attached . . . .  We believe this certificate should relieve Government, at its discretion, of the need for an additional audit." (emphasis in original)).  Defendant can point to no reason—beyond rank speculation—why the SEC's internal communications would suggest that these representations were not material to the SEC's deliberation.  In fact, in the SEC's award determination memo, which was an internal document that was not sent to AiNET at the time of the award, and which summarized the SEC's decision to award AiNET the contract, the SEC specifically cited to the fact that AiNET had a certified Tier IV data center as a reason for the award.  *See* Exhibit 13, at 20 ("AiNET's proposed technical solution not only meets the stated requirements but offers the Government tangible benefits where they exceeded many of the requirements.  Some of these benefits included their offering a certified Tier IV data center . . .").

---

[3] The Government has not attached the cited interview reports as exhibits to its opposition for purposes of brevity. The production Bates numbers are provided for Defendant's ease of reference.  If the Court wishes to review the interview reports, the Government is happy to submit all cited interview reports under seal.

There is simply no evidence to suggest that the Government ignored some trove of potentially exculpatory information by not obtaining additional SEC communications.

Additionally, Defendant misstates the ease of access to the "internal" SEC files. While the SEC-OIG does have the ability to pull communications from the SEC, the reality of Defendant's request is significantly more complicated than he alleges it is in his motion. In the first instance, there is no categorical rule that can surface all the internal communications regarding Defendant, his company, and the data center. What Defendant is requesting would require the Government to craft a list of search terms in hopes of satisfying Defendant's speculative need for communications that may or may not exist in any reasonable volume. This approach presents a host of issues. If the Government crafted a set of search terms and returned documents responsive to those terms, but Defendant found them to be underinclusive based on his speculation of the types of communications that likely must exist within the SEC's files, what would his recourse be? To go back to the Government and propose additional search terms? How would potential privilege issues be handled (an issue that was avoided by seeking external communications)? The prosecution team is not in a position to litigate the SEC's privilege, nor is it in a position to negotiate the proper scope of a document request from the SEC—Defendant is. Once again, the better avenue for such a request would be through a Rule 17(c) subpoena, which would allow Defendant to negotiate scope and privilege directly with the SEC, avoiding the involvement of an unnecessary middleman—the prosecution team.

Defendant, like all defendants, is certainly allowed to attack the breadth of the Government's investigation, he is certainly allowed to speculate that there are unseen documents that would exculpate him, but he should not be allowed to convert base speculation into a fishing expedition conducted by the prosecution team. If he has targeted requests to make of the SEC that

16

he believes will uncover relevant documents, he can make those requests to the SEC via a Rule 17(c) subpoena,[4] but it is not a reason to expand the prosecution team.

## CONCLUSION

For the foregoing reasons, Defendant's motion to compel additional discovery should be denied in its entirety.

Respectfully submitted,

LORINDA I. LARYEA
Acting Chief, Fraud Section
Criminal Division

By:    */s/ Vasanth Sridharan*
Vasanth Sridharan
Senior Litigation Counsel
Robert Spencer Ryan
Criminal Division, Fraud Section
United States Department of Justice
1400 New York Ave. N.W.
Washington, DC 20005
Vasanth.Sridharan@usdoj.gov

---

[4] Note that the Government is not suggesting that the request as constituted in the Motion satisfies the *Nixon* standard for determining the suitability of a trial subpoena pursuant to Rule 17(c).  *See United States v. Nixon*, 418 U.S. 683, 699-700 (1974).

## <u>CERTIFICATE OF SERVICE</u>

On June 27, 2025, I filed the above Motion to Continue on CM/ECF causing it to be served on all parties of record by electronic means.

By:    */s/ Vasanth Sridharan*
            Vasanth Sridharan
            Senior Litigation Counsel